UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

David E. Barber,                    :
            Plaintiff,              :
                                    :
      v.                            :      File No. 1:04-CV-106
                                    :
Saint-Gobain Performance            :
Plastics Corporation                :
            Defendant.              :

## REPORT & RECOMMENDATION
(Document 51)

Plaintiff David Barber ("Barber") has brought this action against his former employer, Defendant Saint-Gobain Performance Plastics Corporation ("Saint-Gobain") alleging that he was terminated from his job in retaliation for requesting reasonable accommodations under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12300, and Vermont's Fair Employment Practices Act ("FEPA"), Vt. Stat. Ann. tit. 21, §§ 495-496, (Count IV), and for asserting his rights under the Vermont Workers' Compensation laws, Vt. Stat. Ann. tit. 21, §§ 643b and 710 (Count V).  Barber also claims that Saint-Gobain breached his employment contract (Count VI) and the implied covenant of good faith and fair dealing (Count VII).  Lastly, Barber claims that he is entitled to punitive damages because Saint-Gobain acted

maliciously (Count VIII).[1]

Saint-Gobain has moved for summary judgment on all remaining counts.  For the reasons set forth below, Saint-Gobain's motion (Doc. 51) is GRANTED in part and DENIED in part.

FACTUAL BACKGROUND

For the purposes of this motion, the following material facts are undisputed unless noted otherwise.

In 1979 ChemFab Corporation ("ChemFab"), Saint-Gobain's predecessor, hired Barber as a Tower Operator at its plant in North Bennington, Vermont.  Barber received an employee handbook sometime after he started working.  The handbook stated that it was not a contract and that Barber was an "at will" employee.  The handbook also outlined ChemFab's "Progressive Discipline" policy with a disclaimer that the company reserved the right, depending on the circumstances, to impose immediate termination for disciplinary violations.

At the North Bennington plant, ChemFab, and then Saint-Gobain, manufactured Teflon-coated fabric using

---

[1]Barber has withdrawn claims alleging that Saint-Gobain violated the ADA and FEPA by unlawfully discriminating against him because he had a disability (Count I) or because Saint-Gobain regarded him as disabled (Count II).  In addition, Barber has withdrawn Count III which alleged that Saint-Gobain failed to reasonably accommodate his disability.  (Doc. 61, n. 3).

large machines known as Towers.  First, a Tower operator
installs a roll of fabric, which the Tower then unrolls
and directs through a "dip" pan where it was coated with
Teflon.  The fabric is then baked in an oven contained
within the Tower and re-rolled on the opposite side of
the Tower.

The Towers in the North Bennington plant were
divided into three categories according to the width of
material each produced: Wide, Intermediate, and Narrow.
In the late 1990's, two Intermediate Towers (Tower R and
Tower S) were combined to operate as one continuous Tower
(Tower R/S).

Towers in the North Bennington plant generally
required two operators, except Tower R/S, which required
three operators.  The parties dispute how much exertion
was required to operate Tower R/S.  Saint-Gobain asserts
that Tower R/S was specifically designed to allow
ergonomic operation by allowing Tower Operators to
perform manufacturing and maintenance work at chest level
without the need to stoop, bend, or kneel.  (Doc. 52, ¶
15).  Saint-Gobain also asserts that Tower R/S did not
require Tower Operators to climb to perform maintenance,

that it was situated in a location free from
obstructions, and that Tower Operators had easy access to
all sides of the machine.  Id.  Barber disputes that
Tower R/S was easier to operate than the older Towers.
Barber asserts that Tower R/S did require employees to
climb up the machinery.  He also disputes that Tower
Operators did not need to stoop, bend, or kneel to
operate Tower R/S.  (Doc. 62, ¶ 15).

When Saint-Gobain purchased the North Bennington
plant from ChemFab, Tower Operators were classified by
skill level.  Level I operators were the least skilled.
Level VII operators were the most skilled.  A Level VII
operator had to be able to operate each of the Towers in
the North Bennington plant and be able to operate at
least nine of the Towers at an "expert" level.  Barber
was classified at the highest skill level.

For all but five years of his employment, Barber
worked as a Tower Operator.  For the five years he was
not an operator, he held the position of Senior Lead.  As
a Senior Lead, Barber was a supervisor responsible for
overseeing production operations, including workplace
safety.  In or about the mid-1990's, ChemFab reorganized

4

its operations.  As a result, Barber was no longer Senior Lead, but might sometimes be Fill-In Lead when necessary.

For many years, Barber performed his job while kneeling on a concrete floor.  In June 2000, Barber took a workers' compensation leave of absence for knee replacement surgery.  ChemFab did not challenge Barber's entitlement to workers' compensation.  Saint-Gobain acquired ChemFab in October 2000 and began managing its operations while Barber was on leave.

In January 2001, Barber was cleared to return to work without restrictions and resumed work on one of the Wide Towers.  Several weeks later, Barber was reassigned to Tower R/S.  Following this reassignment, Barber began experiencing pain in his left knee due to the strains of working on Tower R/S.  Barber saw the company doctor on March 9, 2001 seeking reassignment from Tower R/S because of his knee pain.  Instead, the doctor imposed work restrictions in an attempt to mitigate Barber's discomfort.  These restrictions were accommodated by Saint-Gobain and followed by Barber; however, they did not reduce or eliminate his knee pain.

On March 19, 2001, Barber had his knee re-examined

by Dr. Holmes, the physician who performed his knee replacement surgery. On March 23, 2001, Barber saw the company doctor a second time. He complained that even with the workplace restrictions, his left knee was sore because of the demands of working on Tower R/S. Barber again sought reassignment from Tower R/S, believing that he could work without pain on the Wide Tower he had successfully worked on prior to his reassignment to Tower R/S. Nevertheless, the company doctor again cleared Barber to return to work on Tower R/S, prescribing additional restrictions on climbing, squatting, and lifting.

On March 28, 2001, Barber presented his supervisor with a note from Dr. Holmes requesting that he be removed from Tower R/S and reassigned to another Tower. Barber's supervisor told him he would accommodate this request. However, later that same day the supervisor's decision was overruled and Barber stayed on Tower R/S. Barber was also called into a meeting where the Plant Manager told him that the doctor's note was an insult to the company because Dr. Holmes was trying to tell the company what to do. Saint-Gobain responded in writing to Dr. Holmes that

6

his request to reassign Barber was inappropriate because the current work assignment on Tower R/S accommodated the restrictions imposed by the company doctor.  In addition, Saint-Gobain's letter stated that working on the older Towers required activities that could aggravate Barber's knee condition.

For approximately the next five weeks, Barber continued to work on Tower R/S.  Upon reporting to work on May 8, 2001, Barber complained of abdominal pain.  His supervisor suggested that he visit the emergency room at the local hospital.  Barber reported to work the following day and was overheard by his supervisor discussing that he had been diagnosed with a hernia. Barber was upset because he attributed the hernia to having to work on Tower R/S.  Barber also discussed with other employees who had been diagnosed with hernias what they had received in workers compensation benefits for that injury.  Barber informed his supervisor that he had been experiencing abdominal pain for about a month, but thought the discomfort was nothing more than gas.  Barber also gave his supervisor a note from the emergency room doctor recommending additional lifting restrictions due

to the hernia.

Later the same day, Barber met with Saint-Gobain's
Manager of Human Resources.  During this meeting, Barber
asked if he could collect more money by filing a workers'
compensation claim or a short-term disability claim.  The
Manager informed him that he could not choose between the
benefits, rather, if he experienced a workplace injury,
he should have reported it.  Nonetheless, the Manager
told Barber that he could collect more money by filing a
workers' compensation claim.  The Manager then informed
the Plant Manager about this conversation.

On Thursday, May 10, 2001, Barber submitted a
partially completed Supervisor's Incident Investigation
Report to his supervisor indicating that, after reviewing
work records and searching his recollection, he believed
that his injury occurred at work on March 8, 2001.
Barber described an incident on that day when he
remembered lifting an empty shaft (used to hold fabric)
that weighed 73 pounds.  Barber's supervisor informed the
Plant Manager about the report.  The Plant Manager told
Barber's supervisor to meet with Barber to correctly
complete the report together.

On Friday, May 11, 2001, Barber and his supervisor completed and submitted the report.  In the report, Barber re-asserted that he was injured on March 8, 2001. Because this report was submitted more than 60 days after the injury occurred, Saint-Gobain immediately investigated whether Barber had notice of the mandatory workplace rule requiring employees to immediately report workplace injuries and whether Barber had previously reported any hernia-related symptoms to the company doctor.

Later that same day, plant manager William Rogers learned that Barber had undergone safety training on February 22, 2001.  This training included the requirement that employees immediately report workplace injuries, as well as the consequences for non-compliance. Rogers was also told that the company doctor had no notes indicating that Barber reported any hernia-related symptoms in any visits since March 8, 2001.  In addition, Rogers was also told that Barber's personal physician had no notes indicating that Barber reported any hernia-related symptoms at the time he had his knee checked on March 19, 2001.

Rogers then met with the Human Resources Manager and the Manager of Health, Safety, Environment and Quality to review the facts surrounding Barber's reported injury. The facts as they believed them were: (1) that Barber reported an injury two months after it allegedly occurred; (2) that there were no work incidents, lost time, or reports of any hernia-related injury to anyone; (3) that Barber had inquired whether he would be paid more money if the injury were work related; and, (4) that Barber was aware of the workplace rule requiring immediate reporting of workplace injuries.  Rogers concluded that discharge might be appropriate and reported the situation to the Regional Manager of Human Resources.  The Regional Manager agreed with the decision to fire Barber.  Rogers also consulted Saint-Gobain's Director of Operations for Specialty Coated Fabrics, who also concurred with the Plant Manager's decision to fire Barber.

On Monday, May 14, 2001, Rogers met with Barber, Barber's supervisor, and the Manager of Human Resources. At that meeting, Barber was read a termination letter that said he was being fired for reporting the March 8,

2001 injury two months late and appearing to randomly select a date of injury in order to qualify for Workers Compensation.  At no point in the investigation, or after, was Barber asked to give an explanation why his injury report was late.

Barber was then asked if he would allow the use of bolt cutters to open his locker since he had forgotten his key.  His personal belongings were sorted through and weighed by Rogers.  Rogers asserts this was necessary so that Barber would not have to carry any belongings in excess of his lifting restrictions.  Rogers also carried Barber's personal belongings down the stairs because he said he did not want Barber to fall down and get hurt. In addition, Rogers escorted Barber off of the company property in front of co-workers and smiled and told him not to come back or he would be arrested.

At the time of his termination, Barber had more seniority than any other hourly worker at the plant, was sixth in seniority of all the employees at the plant, had the highest skill level rating for Tower Operators, and had no disciplinary record.

In March 2002, the North Bennington plant was closed

and the equipment and operations were transferred to another facility in Merrimack.  Some employees of the Bennington plant were offered employment at the Merrimack facility.

DISCUSSION

I. <u>Standard of Review</u>

Summary judgment is appropriate if there is no genuine issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>White v. ABCO Eng'g Corp.</u>, 221 F.3d 293, 300 (2d Cir. 2000).  A dispute about a material fact is "genuine" when the non-moving party brings forth such evidence "that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.

In a summary judgment motion, the court must believe the evidence of the non-moving party and draw all justifiable inferences in its favor.  <u>Id.</u> at 255; <u>Lowell v. I.B.M. Corp.</u>, 955 F. Supp 300, 303 (D. Vt. 1997).  "It is a settled rule that 'credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for

the court on a motion for summary judgment.'" <u>McClellan</u>
<u>v. Smith</u>, 439 F.3d 137, 144 (2d Cir. 2006) (quoting
<u>Fischl v. Armitage</u>, 128 F.3d 50, 55 (2d. Cir. 1997)).  In
an employment discrimination case, the court must be
especially cautious in granting summary judgment to the
employer "because the employer's intent is often at issue
and careful scrutiny may reveal circumstantial evidence
supporting an inference of discrimination." <u>Vergara v.</u>
<u>Yonkers Pub. Schs.</u>, 386 F. Supp. 2d 377, 382 (S.D.N.Y.
2005) (quoting <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135
(2d Cir. 1999)).

II. <u>Count IV - Retaliation Under ADA and FEPA</u>

    Barber claims that Saint-Gobain violated the ADA and
FEPA by firing him in retaliation for requesting
reasonable accommodations for his knee injury.  Saint-
Gobain argues that it is entitled to summary judgment
because Barber has not established a prima facie case of
retaliation.  Alternatively, Saint-Gobain argues that
even if Barber has made a prima facie case, he cannot
establish that Saint-Gobain's stated reason for firing
him was pretextual.

    The parties agree that the elements of a claim for

13

unlawful retaliation under the ADA and FEPA are: "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."   Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148-49 (2d Cir. 2002); Robertson v. Mylan Labs., Inc., 176 Vt. 356, 376 (2004).   The parties also agree that the McDonnell Douglas burden shifting analysis applies to this claim.   McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).   According to that framework, if the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to show a non-discriminatory reason for its actions.   If the defendant satisfies this burden, the plaintiff must show that the defendant's stated justification is actually a pretext for retaliation.   Id.; Robertson, 176 Vt. at 367.

A.   Qualified Individual with a Disability

The parties dispute whether Barber must be a "qualified individual with a disability" in order to make

14

a claim for retaliation.

Barber does not have to prove that he is a "qualified individual with a disability" in order to succeed with a retaliation claim under the ADA.  "An individual who is adjudged not to be a 'qualified individual with a disability' may still pursue a retaliation claim under the ADA."  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997).  "Instead, a plaintiff claiming retaliation must prove he engaged in statutorily protected conduct."  Robinson v. Hoover Enter., LLC, No. 1:03-CV-2565, 2004 WL 2792057, at *3 (N.D. Ga. Oct. 20, 2004).  Courts have recognized a plaintiff's request for reasonable accommodations as satisfying this requirement.  Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3rd Cir. 2003).  However, Barber does have to show that he had a "reasonable, good faith belief that []he was entitled to request the reasonable accommodation."  Williams v. Philadelphia Hous. Auth. Police Dept., 380 F.3d 751, 759 n.2 (3rd Cir. 2004); Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000).

Taking the facts in the light most favorable to the plaintiff, Barber has supplied ample evidence that he made good-faith requests to Saint-Gobain to be removed from Tower R/S because of his knee injury.  Barber even supplied a note from the doctor who performed his knee surgery requesting that he be transferred from Tower R/S.

B.  <u>Causal Link</u>

Saint-Gobain argues that Barber has not satisfied his burden of establishing a *prima facie* case of retaliation because he has not shown a causal link between his request for reasonable accommodation and his discharge.  Generally, a plaintiff can establish a causal link between the protected activity and the adverse action with evidence of (1) temporal proximity, (2) disparate treatment of similar conduct by other employees, or (3) retaliatory animus.  <u>DeCintio v. Westchester County Med. Ctr.</u>, 821 F.2d 111, 115 (2d Cir. 1987) (citations omitted).

Saint-Gobain argues that it complied with Barber's medical restrictions at all times and that there is no evidence that it harbored any unlawful animus because of his requests.  However, Barber has presented sufficient

evidence to the contrary.  First, Barber was transferred
from the Tower where he was working successfully and
placed on the more demanding Tower R/S.  While Saint-
Gobain claims this was an "accommodation" for his knee
condition, the accommodation actually exacerbated
Barber's pain.  When Saint-Gobain was informed of
Barber's increasing restrictions, it continued to insist
on assigning him to Tower R/S.  Saint-Gobain argues that
Tower R/S was the best fit for Barber's physical
limitations; however, the facts show that the pain in
Barber's knee prevented him from successfully working on
Tower R/S.  He had been able to successfully perform his
duties on the old Tower.  Yet, Saint-Gobain refused to
accommodate requests from Barber, his direct supervisor,
and the doctor who performed his knee replacement
surgery, that Barber be reassigned to the other Tower.
It is undisputed that Saint-Gobain has the discretion to
assign Tower operators; however, the evidence suggests
that Saint-Gobain used this power to force Barber to
perform a job that he was not physically able to do.
This evidence demonstrates an unlawful animus towards
Barber for requesting accommodations and is sufficient to

establish the causal link necessary for a *prima facie* case of retaliation.

C.   Pretext

According to Saint-Gobain, Barber was fired for violating a workplace safety rule.  Saint-Gobain argues that Barber has failed to show that this legitimate non-retaliatory reason for discharging Barber was pretext for retaliation.

Barber has presented evidence that the reason given for his firing was merely a pretext designed to hide the fact that Saint-Gobain's new management was trying to get rid of costly employees.  For example, Barber has presented disparaging statements by managers about workers who apply for workers' compensation and insinuated that those employees with physical limitations were "deadwood" that needed to be replaced.  (Declaration of Kenneth L. Lorette, Jr. ("Lorette Decl."), ¶ 6). Accordingly, a question of material fact exists as to whether Saint-Gobain fired Barber in retaliation for his requests for reasonable accommodation.  Therefore, Saint-Gobain's motion for summary judgment on Count IV should be denied.

III. <u>Count V - Violation of Vermont Workers' Compensation</u>
     <u>Laws</u>

Barber claims that Saint-Gobain fired him in
retaliation for filing a workers' compensation claim, and
failed to rehire him for the Merrimack Facility when the
North Bennington Plant closed.  Barber also claims that
when he returned from leave for his work-related knee
replacement surgery, Saint-Gobain violated its obligation
to reinstate him to his prior position or a suitable
alternative.

A. <u>Retaliation for Workers' Compensation Claim</u>

First, Barber argues that he has presented
sufficient evidence of Saint-Gobain's discriminatory
animus against employees who file workers' compensation
claims for this Court to apply a mixed motive analysis.
In a mixed motive case, the plaintiff must first
establish that an "impermissible criterion was . . . a
'motivating' or 'substantial' factor in the employment
decision." <u>Wentworth v. Fletcher Allen Health Care</u>, 171
Vt. 614, 617-18 (2000) (quoting <u>de la Cruz v. N.Y. City</u>
<u>Human Res. Admin. Dep't of Soc. Servs.</u>, 82 F.3d 16, 23
(2d Cir. 1996).  Once the plaintiff satisfies this
burden, the defendant must show that "it would have

19

reached the same decision even in the absence of the impermissible factor." Id. at 618.

> It is for the jury to determine initially whether
> the plaintiff's evidence establishes that [the
> discriminatory factor] was a motivating factor in
> the defendant's employment decision.  If the
> plaintiff fails to make this initial showing, then
> the McDonnell Douglas analysis is applicable.
> Nevertheless, unless the trial court finds that the
> plaintiff's evidence is insufficient to make this
> preliminary showing as a matter of law, under
> Vermont law, the issue must go to the jury.

Hodgdon v. Mt. Mansfield Co., Inc., 160 Vt. 150, 161-62

(1992) (citing Graff v. Eaton, 157 Vt. 321, 326-27

(1991)); Grant v. Hazelett Strip-Casting Corp., 880 F.2d

1564, 1569 (2d Cir. 1989) ("It was for the jury to decide

whether [age] played a 'motivating or substantial part'

in the [plaintiff's] dismissal.").  Hence, if a plaintiff

provides

> nonstatistical evidence . . . [such as] policy
> documents or statements of a person involved in the
> decisionmaking process that reflect a
> discriminatory or retaliatory animus of the type
> complained of in the suit . . . . that is
> sufficient to permit the factfinder to infer that
> that attitude was more likely than not a motivating
> factor in the employer's decision,

Ostrowski v. Atl. Mut. Ins. Cos., 968 F.2d 171, 182 (2d

Cir. 1992), then summary judgment would not be

appropriate, and the question would have to go to the

jury.[2]

     To survive summary judgment, therefore, Barber must

provide "more than 'stray remarks', 'statements by non-

decisionmakers', and 'evidence unrelated to the

decisional process'."   Tyler v. Bethlehem Steel Corp.,

958 F.2d 1176, 1187 (2d Cir. 1992).   To this end Barber

has presented evidence of statements made by William

Rogers, the plant manager who was involved in firing

Barber and for offering transfers to the Merrimack

facility.   According to the testimony, Rogers said

"people who are hurt are accident-prone, and we're going

to get rid of these people."   (Lorette Decl. at ¶ 6).

Rogers also referred to people on workers' compensation

as "deadwood" that would be trimmed.   (Id.).   Rogers also

said "since I am in charge of production and I'm the

overseer of this thing, I'm going to see to it that the

people who are on workers' compensation, or who have bad

work records, we'll see to it that they're eliminated."

---

[2] "[T]he direct method of proof contemplated by the last step of [McDonnell
Douglas-]Burdine is the same as the plaintiff's initial burden under Price
Waterhouse; the only difference is that under Price Waterhouse, the plaintiff
begins by focusing on the alleged discrimination itself, while the McDonnell
Douglas-Burdine plaintiff starts by focusing on his own qualifications and the
employer's needs.  When the more focused proof of discrimination is presented,
the court need not go through the McDonnell Douglas analysis."  Tyler v.
Bethlehem Steel Corp., 958 F.2d 1776, 1185 (2d Cir. 1992).

(Id.).  This evidence suggests the existence of discriminatory animus against individuals who use workers' compensation.

Saint-Gobain argues that there is no evidence that these comments were directed at Barber or made in connection with the decision to terminate him.  However, Barber need only present evidence that the "persons involved in the decisionmaking process" exhibited "the alleged discriminatory attitude . . . sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision."  Ostrowski, 968 F.2d at 182.  In Tyler, for example, a witness testified that "the sales force was getting too old; [plaintiff's] layoff helped decrease the average age of Bethlehem's sales force."  958 F.2d at 1186.  Also, the defendant's "internal memorandum recommending Tyler's layoff listed his age and years of service."  Id.  Lastly, the defendant "had a special category of employees known as 'Young Tigers' - an evaluative category from which a long-in-the-tooth employee like Tyler was by definition excluded."  Id. at 1187.  The Tyler court was satisfied that Tyler had

proved "that age actually entered into Bethlehem's decisional processes" such that the mixed motive jury instruction was warranted.   Id. at 1186-87.

At the summary judgment stage, it is not for this Court to weigh the evidence but simply to determine whether the evidence can support a jury determination that Barber's workers' compensation claim was a motivating factor in Saint-Gobain's decision to fire him and not to rehire him at the Merrimack plant.  This Court is persuaded that Barber has presented sufficient evidence to support an inference that Saint-Gobain's decisions were motivated by Barber's workers' compensation claim.

B. Failure to Reinstate Under § 643b

Saint-Gobain argues that Barber's claim under Vt. Stat. Ann. tit. 21, § 643b(b) must fail because it is undisputed that Barber was in fact reinstated to his previous employment as a tower operator after he recovered from his knee replacement surgery.  Barber contends that by assigning him to Tower R/S, Saint-Gobain failed to provide a suitable alternative position.

According to § 643b(b), an employer "of a worker

23

disabled by injury compensable under this chapter [Workers Compensation] shall reinstate the worker when his or her inability to work ceases . . . .  A worker who recovers within two years of the onset of the disability shall be reinstated in the first available position suitable for the worker given the position the worker held at the time of the injury."  Vt. Stat. Ann. tit. 21, § 643b(b).

It is undisputed that Barber returned to work as a Tower Operator after he had recovered from his knee replacement surgery.  It is also undisputed that Tower Operators are not hired to work on any particular tower and Saint-Gobain retains the authority to assign its operators as needed.

Barber argues that § 643b obligates Saint-Gobain to assign him to a tower that accommodates his post-surgical physical limitations.  Although this particular issue has not yet been addressed by the Vermont Supreme Court, the court has recognized that "Section 643b(b) creates only a narrow job protection."  Payea v. Howard Bank, 164 Vt. 106, 109 (1995).  Moreover, the court has refused to "borrow from [Vermont's] workers' compensation statute

24

and the federal Americans with Disabilities Act, to import a 'reasonable accommodation' requirement into § 643b(b) . . . ." <u>Wentworth</u>, 171 Vt. at 617.  In that case, a nurse who had returned to work after recovering from back surgery was terminated after one week because "there was no nursing job . . . that plaintiff could do with a weight restriction of fifteen pounds." <u>Id.</u> at 615.  Wentworth argued that under § 643b "a suitable job [is] one for which the employee through training can obtain the skill required in a reasonable amount of time." <u>Id.</u> at 617.  Therefore, she argued Fletcher Allen violated its reinstatement obligation by failing to hire her as a Unit Secretary, a position requiring typing skills of 30 words per minute, which Wentworth did not have.  The <u>Wentworth</u> court decided not to read § 643b so broadly as to impose on the employer a "responsibility to provide training to enable an applicant to meet a skill requirement. . . . Nor . . . [to] wait until the applicant has on her own acquired the required skill."

In light of the Vermont Supreme Court's narrow reading of § 643b, this Court is not inclined to read into the statute an obligation for an employer to provide

"reasonable accommodation," especially to an employee who in fact was reinstated to his previous employment. Therefore, this claim should be dismissed as a matter of law.

IV.   <u>Count VI - Breach of Employment Contract</u>

Saint-Gobain asserts that summary judgment is appropriate because Barber has failed to establish that he had a contractual relationship with Saint-Gobain. Alternatively, Saint-Gobain argues that even if there was an employment contract, Barber was discharged for just cause.  Barber argues that Saint-Gobain's personnel policies and practices are inconsistent with at-will employment thereby creating an implied employment contract that Barber could only be fired for just cause.

A.   <u>Handbook</u>

In Vermont, employment for an indefinite period of time is generally considered "at will."  This presumption may be rebutted by evidence indicating that the employer expressly or by clear implication foreclosed its right to terminate except for just cause.  <u>Benoir v. Ethan Allen, Inc.</u>, 147 Vt. 268, 270 (1986).  At-will employment contracts may be modified by express agreement, statute,

26

public policy, an employer's personnel policies or
practices, and/or by actions or communications made by
the employer that reflect assurances of continued
employment.  Foote v. Simmonds Precision Prods. Co., 158
Vt. 566, 570-71 (1992); McKenny v. John V. Carr & Son,
Inc., 922 F. Supp 967, 975 (D. Vt. 1996) (citing Benoir);
Ploof v. Brooks Drug, Inc., Civ. No. 89-270, 1991 WL
497170 (D. Vt. Aug. 28, 1991).  In fact, an employer may
unilaterally modify an employee's "at will" status by
adopting written company policies that are inconsistent
with that status.  McKenny, 922 F. Supp. at 977 (citing
Taylor v. Nat'l Life Ins. Co., 161 Vt. 457, 464, 652 A.2d
466 (1993)).

An employer can avoid modifying at-will employment
by including a disclaimer in its written policy.
However, the effectiveness of any disclaimer depends on
the circumstances of each case.  Ross v. Times Mirror,
Inc., 164 Vt. 13, 19 (1995); Mecier v. Branon, 930 F.
Supp. 165, 169 (D. Vt. 1996).  "When the terms of a
manual are ambiguous . . . or send mixed messages
regarding an employee's status, the question of whether
the presumptive at-will status has been modified is

properly left to the jury." <u>Dillon v. Champion Jogbra,
Inc.</u>, 175 Vt. 1, 6-7 (2002).

A progressive discipline policy is generally
inconsistent with at-will employment. <u>Id.</u> at 8.  For
example, in <u>Dillon</u>, the Vermont Supreme Court decided
that the terms of the defendant's employee handbook were
inconsistent with the included disclaimer and at-will
employment generally.  The defendant's handbook
"established three categories of violations of company
policy and corresponding actions to be generally taken in
each case. It delineates progressive steps to be taken
for certain types of cases . . . and time periods
governing things such as how long a reprimand is
considered 'active.'" <u>Id.</u>  Therefore, the court
concluded that, at best, the handbook sent mixed messages
to the employees creating a question for the jury whether
there was an implied contract modifying the employee's
at-will status.

Like the defendant in <u>Dillon</u>, Saint-Gobain has a
written policy of progressive discipline in both its
employee handbook and safety rules.  Section V of the

ChemFab Hourly Employee Handbook[3] ("Handbook") lists examples of inappropriate conduct at three disciplinary levels.  The first level lists grounds for immediate dismissal, the second level describes conduct "that may result in discipline, up to and including, discharge," and the third level lists situations that may subject an employee to counseling and/or discipline.  The Handbook then describes the five steps of Saint-Gobain's progressive discipline policy.  At Step 1, an employee is "consulted" by his or her supervisor.  If there is no improvement within 90 days, Step 2 requires an oral warning.  Again, if there is no improvement within 90 days, an employee receives a written warning.  At Step 4, an employee whose performance has not improved within the requisite 90 days will be suspended without pay.  After another 90 days without improvement, an employee will be terminated.  "Every 90 days . . . of sustained improvement will reverse one step in the Scale."  This policy is also reflected in the Plant's safety rules.  As described in the Safety & Health Program, "After informal counseling . . . any further infractions of the rules

---

[3]Saint-Gobain retained the ChemFab Handbook when it purchased ChemFab.

will progress to step 1." Step 1 is an oral warning.
Step 2 is a written warning. Step 3 is suspension and
Step 4 is termination.

Saint-Gobain argues that the Handbook and safety
rules include valid disclaimers that employment remains
at-will. However, "[t]he mere inclusion of boilerplate
language providing that the employee relationship is at
will cannot negate any implied contract and procedural
protections created by an employee handbook." Farnum v.
Brattleboro Retreat, Inc., 164 Vt. 488, 494 (1995). Any
disclaimers "must be evaluated in the context of all the
other provisions in the handbooks and any other
circumstances bearing on the status of the employment
agreement." Id. at 495. In this case, Barber has also
presented testimony from Bruce Knapp, his supervisor,
describing the plant's consistent use of the progressive
discipline policy. Knapp testified that he participated
in disciplining employees in possibly hundreds of
instances. He testified that the company's progressive
discipline policy, or something like it, was followed in
all instances that he could think of. (Knapp Dep. Tr.
49-50).

30

Under these circumstances, the Court finds Saint-Gobain's Handbook is ambiguous and sends mixed messages to its employees regarding their status as at will employees. "[W]hen an employer takes steps to give employees the impression of job security and enjoys the attendant benefits that such an atmosphere confers, it should not then be able to disregard its commitments at random." Dillon, 175 Vt. at 5. Therefore, whether Barber's employment was terminable only for just cause is a jury question that cannot be resolved by summary judgment.

B.   Just Cause

The parties also dispute whether Barber was in fact terminated for just cause. Given the discussion above, it would be premature for the Court to decide whether Barber was in fact terminated for just cause. Moreover, when an employer presents a reason for discharging the employee, but the employee presents evidence of an alternative reason, it is for a jury to decide "the employer's true reason for discharging the employee." Ainsworth v. Franklin County Cheese Corp., 156 Vt. 325, 330 (1991) (quoting Toussaint v. Blue Cross & Blue Shield

31

of Mich., 292 N.W. 2d 880, 896 (Mich. 1980)).  As
discussed above, Barber has presented evidence that
creates a question for the jury as to whether he was
fired in retaliation for requesting reasonable
accommodations for his knee injury.  Therefore, summary
judgment for Count VI should be denied.

V.   Count VII - Covenant of Good Faith and Fair Dealing

     As the parties concede, this claim rises and falls
with Barber's breach of contract claim.  An implied
covenant of good faith and fair dealing inheres in every
contract.  Lopresti v. Rutland Reg'l Health Servs., Inc.,
177 Vt. 316, 332 (2004).  Hence, if there is no
employment contract between Barber and Saint-Gobain,
Barber cannot bring a claim for breach of the covenant.
Green v. Vt. Country Store, 191 F. Supp. 2d 476, 482
(2002) ("Vermont law does not 'recognize the implied
covenant of good faith and fair dealing as a means of
recovery where the employment relationship is unmodified
and at-will.'" (quoting Dicks v. Jensen, 768 A.2d 1279,
1286 (Vt. 2001)).  Because the jury must decide whether
there is an employment contract between Barber and Saint-
Gobain, the breach of the implied covenant of good faith

and fair dealing claim cannot be resolved by summary judgment at this time.  Moreover, good faith and fair dealing is "[c]ontextual and fact-specific . . . [and] is ordinarily a question of fact . . . particularly well-suited for juries to decide."  <u>Carmichael v. Adirondack Bottled Gas Corp. of Vt.</u>, 161 Vt. 200, 209 (1993).

VI.   <u>Count VIII - Punitive Damages</u>

Saint-Gobain argues that Barber has not presented sufficient evidence to support his claim for punitive damages.

A plaintiff can recover punitive damages by showing "actual malice on the part of the defendant."  <u>McKenny</u>, 922 F. Supp. at 984.  Saint-Gobain argues that Barber has failed to show that it acted with actual malice.  Actual malice can be shown through "conduct manifesting personal ill will, evidencing insult or oppression, or showing a reckless or wanton disregard of plaintiff's rights." <u>Ainsworth</u>, 156 Vt. at 332.

Barber argues that Saint-Gobain's malice is evidenced by (1) the fact that he was summarily dismissed after reporting a work related injury after more than twenty years of employment, (2) was not given an

33

opportunity to present his version of events, (3) after termination the contents of his locker were inventoried and weighed, (4) Barber was escorted off the property, mocked and told not to return upon risk of being arrested.  Given the factual questions that remain regarding the true reason that Barber was fired, and the direct evidence of animus Barber has presented regarding his retaliation claim, this Court is persuaded that there is a genuine issue of fact for the jury as to whether Saint-Gobain acted with malice when it fired Barber.

## CONCLUSION

For the foregoing reasons, I recommend that the Saint-Gobain's motion for summary judgment (Doc. 51) be GRANTED in part on Count 5 and DENIED on Counts 4, 6, 7 and 8.

Dated at Burlington, in the District of Vermont, this 7th day of July 2006.

/S/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

34

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify portions of the proposed findings, recommendations or report objections. Failure to file objections within the specified time waives the right to appeal the District Court's order. <u>See</u> Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).